UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STUDIO & PARTNERS, s.r.l.,

      Plaintiff,

v.                                                                            Case No. 06-C-628

KI (a/k/a KRUEGER INTERNATIONAL, INC.),

      Defendant.

## DECISION AND ORDER

      Plaintiff Studio & Partners ("S&P"), an Italian company that designs furniture, brought suit against KI, a Wisconsin corporation that manufactures and sells furniture to businesses and other institutions, alleging fraudulent concealment, breach of fiduciary duty, misappropriation, unjust enrichment and misrepresentation. S&P also brought a claim for correction of inventorship under 35 U.S.C. § 256. Underlying all of these claims is S&P's contention that KI misappropriated S&P's design for an academic-style chair and then concealed that fact from S&P once it began selling the chair in the American market.

      From the outset this lawsuit has given rise to innumerable discovery disputes, including motions to compel, motions to quash, motions for protective orders, as well as some four motions seeking sanctions. Though the spate of discovery motions was remarkable in its own right, an even more unusual development is the parties' filing of four motions for summary judgment: as discovery progressed, the theories of the case seemed to shift with the seasons as new arguments came into fashion. Further, it appears that discovery has proceeded apace well beyond the discovery cutoff

date. For these and other reasons, the court deemed it advisable to allow the substantive disputes to crystalize into final form rather than attempt to enter the fray *in medias res*; the result of this deferment is that most of the motions dating back to March that are now rendered moot or at least stale.

In any event, where earlier dispositive motions had invoked more factually complex defenses such as laches and somewhat esoteric matters involving domestic and foreign corporate law, the final iteration of summary judgment briefing has identified a much more basic defense applicable to the plaintiff's state law claims. Specifically, the defendant argues that four of the plaintiff's state law claims (that is, all except for claims I and III) are barred by the applicable five-year statute of limitations. KI's most recent motion also argues for summary judgment on claims not barred by the statute of limitations, arguing that claim I fails as a matter of law and that S&P lacks standing to bring claim III. As set forth below, I conclude the defendant's latest motion should be granted with respect to each of these claims.

**I. Background**

The origin of this lawsuit dates to the design and development of a chair intended to be used in schools and other academic settings. Originally dubbed "CAMPUS," the chair design was developed by an Italian firm called Studio DeLucchi in the mid-1990's and licensed to a German company named Casala Mobelwerke. After Casala Mobelwerke went into bankruptcy, a German subsidiary of KI, Casala-KI, purchased several of its assets.[1]

---

[1]Throughout this opinion, I treat KI and Casala-KI as the same entity. Similarly, I treat Studio & Partners as the successor in interest to any rights Studio DeLucchi had in the CAMPUS design. Though both sides have raised legal arguments questioning these premises, the result reached herein does not turn on matters of corporate identity or assumptions of rights.

2

In 1995, despite some initial interest, KI had shied away from the CAMPUS product, stating that its production would be too expensive. In an attempt to generate further interest, S&P then submitted CAMPUS for a design award, which it won, and that award appeared to reignite KI's interest in the design. Between 1996 and 1998 the two companies worked together to attempt to bring the product to market, and S&P alleges that it contributed significant innovations and know-how to the effort. In a January 1998 letter, however, Casala-KI indicated that it was not interested in going forward with the design. This was misleading, S&P claims, because KI (the American parent company) *was* going to market the design, essentially taking advantage of S&P's design contributions without S&P's knowledge or input. In fact, within a few months KI's own design team was hard at work on a product and was consulting photos of the CAMPUS chair for inspiration.

According to S&P, KI's concealment of its misappropriation allowed KI to realize some $50 million in sales of the product (later called "Einstein" and then "Intellect") without having to pay a license fee or compensate S&P in any way for its contributions. (KI suggests the design has actually been a commercial failure.) Further, KI applied for and received (in 2003) patents on a desk and chair using the Einstein / Intellect design, an effort in which S&P claims it should have been included (though it never applied for a patent itself).

Although KI concedes that the Einstein / Intellect design was actually inspired in part by a photo of the CAMPUS product, it disputes the notion that S&P was the product's "true" inventor. In fact, in its patent application it submitted a picture of a CAMPUS chair as prior art. KI also generally downplays any role S&P played in contributing to the product's development. In any event, because KI's summary judgment motions focus on the timeliness of S&P's claims (as well as

3

other threshold matters) rather than the merits of the underlying inventorship dispute, I will sidestep inventorship issues and confine my discussion to the matters raised in the most recent summary judgment motion.

**II. Analysis**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

**1. Foreign Statutes of Limitations**

KI argues that four of S&P's claims are barred by Italy's five-year statute of limitations, which applies by virtue of Wisconsin's borrowing statute. In particular, the claims KI believes are time barred are: claim II (breach of fiduciary duty), IV (misappropriation), V (unjust enrichment) and VI (misrepresentation). All four of these claims are variations on S&P's argument that KI failed to disclose its efforts to sell chairs based on the CAMPUS design. By misappropriating S&P's design and by falsely telling S&P that it was not interested in pursuing the design, KI (S&P argues)

4

misrepresented its intentions and was unjustly enriched. The bulk of this activity (whether affirmative misrepresentations or omissions) occurred in the period immediately following KI-Casala's January 1998 letter informing Studio DeLucchi that it was not planning to market the design.[2]

S&P raises two principal arguments in opposition. First, it asserts that the claims are not covered by the borrowing statute and thus Italy's statute of limitations should not apply. Second, even if Italy's five-year statute of limitations applies, the time period should be equitably tolled because S&P was unaware of KI's conduct until 2005.

Wisconsin's borrowing statute provides that "[i]f an action is brought in this state on a foreign cause of action and the foreign period of limitation which applies has expired, no action may be maintained in this state." Wis. Stat. § 893.07. The question is whether the claims at issue are a "foreign cause of action." S&P argues that the borrowing statute does not apply if even a minuscule part of the injury occurs in Wisconsin. *Faigin v. Doubleday Dell Pub. Group,* 98 F.3d 268, 272 (7th Cir. 1996). S&P believes it sustained injuries in Wisconsin because that is where KI: (1) misappropriated its designs; (2) concealed its misappropriation; (3) sold the products; (4) caused the filings for fraudulent patents; and (5) earned profits on the stolen design. (S&P Brief in Opposition, Dkt. # 299 at 8.) Yet it is apparent that these events reflect where the alleged injury was *caused*, not where it *occurred*. In evaluating the same question involving similar fiduciary duty and misrepresentation claims, Judge Crabb concluded that "each of these tort claims is a foreign cause of action under § 893.07 because the economic effects were felt only in California, the place of

---

[2]In contesting KI's statute of limitations defense, S&P does not argue that Italy's five-year limitations period is satisfied as to any of these claims; it merely argues that Italy's statute of limitations is inapplicable.

5

plaintiffs' residence." *Terranova v. Terranova,* 883 F.Supp. 1273, 1278 (W.D. Wis. 1995). That is, the injury occurs where it is felt rather than where it originates: "The [place of injury] rule asks the practical question 'who became poorer and where did they become poorer?'" *Id.* (quoting *Heineman v. S & S Machinery Co.,* 707 F.Supp. 86, 89 (E.D.N.Y. 1989)). Here, it is undisputed that S&P became poorer (if at all) in Italy, not Wisconsin.

Perhaps recognizing that KI's own actions in Wisconsin do not govern the issue, S&P adds a twist and suggests that it suffered injury here because its reputation in Wisconsin was damaged. That is, S&P was "given no credit" for the design and thus lost the chance to sell the product here, compete for awards or receive attention in trade journals. Again, however, this is injury S&P allegedly suffered as an *Italian* company, not as a Wisconsinite. To the extent S&P became poorer, it became a poorer Italian company. (In fact, there is no indication that S&P did any business in Wisconsin whatsoever.)

Undeterred, S&P cites *Faigin* for the proposition that even negligible damage to one's reputation in the forum state can remove the case from the borrowing statute. 98 F.3d 268. There, the Seventh Circuit refused to apply the borrowing statute in a defamation case even though only .14% of the allegedly defamatory book's sales (an autobiography of Buffalo Bills' quarterback Jim Kelly) were in Wisconsin. But that result (over a dissent) was compelled by a "quirk" of state libel law which deemed injury to occur in any state in which the offending material was published. *Id.* at 270. S&P has not brought a defamation claim in this lawsuit, and the only damages it allegedly suffered are financial damages it suffered as an Italian company. Even under *Faigin* there must still be *some* injury (even if negligible) in Wisconsin for the action to be deemed non-foreign, and S&P

6

has not cited any concrete injury it suffered here.³

Finally, S&P cites a case from this court, *Stupak v. Hoffman-La Roche, Inc.,* but that case squarely supports KI's position. 315 F. Supp.2d 970, 975 (E. D. Wis. 2004). In *Stupak*, I concluded that even though the deceased party had received allegedly negligent physician care in Wisconsin, the treatment was not the "injury." Instead, the plaintiffs' claim was for wrongful death, and that death (the injury) occurred in Michigan, the place of the deceased's residence. As such, the borrowing statute applied and Michigan's shorter statute of limitations controlled. As in *Stupak*, even if the injury was caused in Wisconsin, it was suffered in Italy, and I therefore conclude that Wisconsin's borrowing statute is applicable and that Italy's five-year statute of limitations should apply.

As a fallback position, S&P suggests that even if Italy's statute of limitations applies, Wisconsin's principles of equitable tolling should come into play and prolong the limitations period.⁴ Assuming that equitable tolling under Wisconsin law is a viable remedy, it is nevertheless inapplicable here.⁵ Under Wisconsin law, a court may exercise its equitable discretion to extend the limitations

---

³In fact, under S&P's theory the borrowing statute would almost never be applied because presumably a plaintiff could always concoct some negligible or inchoate injury occurring in Wisconsin that would render the injury non-foreign.

⁴KI has offered evidence that Italy does not have a "discovery rule" – in other words, the time period begins running from the time the claim arose rather than when the claim is discovered by the plaintiff. According to the opinion of Domenico Sindico, an Italian lawyer with an American Ph.D., the time period begins running from the date of the offense. (Lasee Aff., Ex. 21.) S&P has not contested that proposition, although as discussed herein it conflates the concepts of equitable tolling and discovery.

⁵*Scott by Ricciardi v. First State Ins. Co.,* 456 N.W.2d 152, 157 (Wis. 1990) ("While the 'borrowed' foreign statute determines the applicable period of limitation, we look to the Wisconsin tolling law to determine if that period has expired.")

7

period in certain circumstances. This is, in effect, a form of estoppel intended to prevent the defendant from benefitting from its own inequitable conduct in inducing the plaintiff to forestall filing suit. *Hester v. Williams,* 345 N.W.2d 426, 431 (Wis. 1984). Key among the equitable tolling factors cited in *Hester* is the requirement that "[t]he aggrieved party must have failed to commence an action within the statutory period because of his or her reliance on the defendant's representations or act." *Id.*

Here, during the limitations period there were no acts or representations made by KI, and obviously no reliance by S&P. In fact, S&P's case is based on the assertion that KI never even communicated with S&P during this period. As such, there is no evidence that any of KI's actions or representations caused S&P to delay in filing this lawsuit, and thus equitable tolling is inapplicable.

S&P glosses over this fatal fact and devotes most of its tolling argument to defending its own actions and diligence. In particular, it suggests that its ignorance about KI's actions (and resulting delay in filing suit) was reasonable because it took steps to investigate any wrongdoing and was still unable to discover the misconduct until 2005. (KI strongly asserts that S&P *did* know about the injury much earlier.) But S&P's argument confuses the discovery rule with equitable tolling. Under Wisconsin's discovery rule, "a plaintiff's claim accrues when the plaintiff objectively knows, or with reasonable exercise of care should have known, the cause of the injury and the defendant's part in that cause." *Allen v. Wisconsin Public Service Corp.,* 2005 WI App 40, 694 N.W.2d 420, 424 (Wis. Ct. App. 2005). This is a rule governing when the claim accrues, not whether a claim should be equitably tolled. As noted earlier, equitable tolling is based not so much on the plaintiff's diligence

8

in discovering his injury but on the defendant's own conduct in forestalling the filing of the plaintiff's claim; as such, the reasonableness of S&P's investigations, or when it "discovered" the claim has nothing to do with equitable tolling.[6] Here, there is no dispute that the limitations period began some time prior to 2000, and under Italian law the discovery rule is inapplicable. Because there is no basis for equitable tolling under these facts, Italy's five-year statute of limitations applies to bar the plaintiffs' claims II, IV, V and VI.

**2. Claim III**: **Correction of Inventorship**

As noted earlier, KI obtained two design patents in May 2003, both of which listed Scott Bosman and Frederick Bohl (both KI employees) as the inventors. The '348 patent describes the Einstein chair, while the '356 patent teaches a student desk in the same style. (Lasee Decl., Exs. 15, 16.) S&P's correction of inventorship claim is not particularly well-developed, but it appears S&P wants the patent corrected to reflect that Torsten Fritze, an S&P design partner, was a co-inventor of the patents.[7] Title 35 U.S.C. § 256 allows parties to file for correction of inventorship either with

---

[6]S&P does not argue that Wisconsin's discovery rule should somehow be grafted onto Italy's statute of limitations, but even if it did there would be no basis for such a result. *See, e.g., Helinski v. Appleton Papers,* 952 F.Supp. 266, 274 (D. Md. 1997) ("It seems illogical to borrow Virginia's statute of limitations, but not the provision determining when the limitations period begins."); *Mayor v. Ford Motor Co.,* 2004 WL 1402692, *6 (Ohio Ct. App. 2004) ("If that right no longer exists because of a bar by the statute of limitations in the state in which the cause of action accrued, it seems untenable to extend the time period by use of this state's discovery rule to allow the claim to be filed in Ohio.")

[7]KI makes a strong laches argument and seeks dismissal of the entire action. Laches can constitute a defense in a correction of inventorship claim. *Stark v. Advanced Magnetics, Inc.,* 29 F.3d 1570, 1573 (Fed. Cir. 1994). In fact, the entire purpose of laches and other equitable defenses is to prevent a party from sitting on his rights, only to pounce once the defendant has made successful use of his contributions. *Haas v. Leo Feist, Inc.,* 234 F. 105, 108 (S.D.N.Y. 1916) (equity will not allow a plaintiff to avail himself over time of defendant's successful infringement with no risk to himself) (Hand, J.).

9

the PTO or district court:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.
>
> The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

KI asserts that S&P lacks standing to seek correction of KI's patents, as S&P is not itself an inventor and has asserted no ownership interest in the patent. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). The burden of proof is on the plaintiff to clearly "allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *United States v. Hays,* 515 U.S. 737, 743 (1995) (citations omitted). The familiar requirements for Article III standing are as follows:

> First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

---

Yet it is clear that the Federal Circuit takes a more restrictive view of laches in the correction of inventorship context. The Federal Circuit views the accrual of the inventorship claim not at the time the putative inventor *conceives* of the now patented idea, but when he learns that a patent has been issued. *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.,* 988 F.2d 1157, 1162 (Fed. Cir. 1993). In other words, the correction of inventorship claim arises only when there is something in an existing patent to "correct". As such, the correction of inventorship claim "accrued" only at some point in 2003 when the patents were issued, and thus there is little basis to apply laches to S&P's correction of inventorship claim.

10

*Lujan,* 504 U.S. at 560-61 (citations omitted).

KI first suggests that S&P, a corporate entity, cannot be the inventor and thus has no standing to seek correction of the patents' inventorship. While it is true that a corporation cannot be the named inventor of a patent, that does not mean a corporation automatically lacks Article III standing to seek a change to the patent. This is reflected in § 256 itself, which assumes that multiple parties may be involved in a correction proceeding: "[t]he court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly." 35 U.S.C. § 256.

KI's second argument is more persuasive. KI argues that even if S&P's underlying factual arguments about inventorship are correct, S&P has not attempted to show that it has any concrete financial interest in having the proper inventors' names listed on the patent. In other words, even if it is successful in showing that one or more Studio DeLucchi employees contributed to the patented designs, S&P itself has not alleged that it stands to gain anything from correcting the patent to reflect their contributions. And because S&P has demonstrated no financial interest in the patents at issue, its success on any correction of inventorship claim would not actually remedy any injury it has suffered.

S&P does not argue that it has any financial or ownership interest in the patents. *Cf, e.g., Memry Corp. v. Kentucky Oil Technology, N.V.,* 2006 WL 3734384, *8 (N.D. Cal. 2006) ("It is clear . . . that KOT has sufficient pecuniary interest to seek correction of inventorship of STC's patents.") In fact, S&P's theory of the case is that it was owed money for contributing to the design *regardless* of any intellectual property protection ultimately obtained: its right to payment "was not dependent upon whether the original version of the design was capable of protection under any

11

intellectual property right." (Dkt. 300, ¶¶ 7, 9.) Thus, because S&P's right to payment is not dependent on *who* actually invented the designs, it admittedly has no financial interest in the outcome of any inventorship dispute.

Instead, S&P relies on a Federal Circuit case holding that a financial interest in the patent is not a prerequisite for a party to have standing to bring a § 256 claim. In *Chou v. University of Chicago,* the Federal Circuit found that a putative inventor, a graduate student and employee of the University of Chicago, had standing to bring a § 256 claim even though she had signed agreements assigning all rights to her inventions to the university. 254 F.3d 1347 (Fed. Cir. 2001). The University sought dismissal of her claim on the basis of standing, but the court concluded that even though the alleged inventor had no *financial* interest in being a named patentee, she nevertheless had a possible reputational interest in being named as an inventor. That is, being named as an inventor of a patent can bring accolades and confer significant intangible benefits to an individual sufficient to give the claimant a sufficient stake in the outcome.

*Chou* stands for the simple principle that an inventor may have standing even if she has no financial interest in the proceedings. It does not suggest, however (and S&P cites no other authority) that a *non*-inventor with no ownership interest in the patent has standing to bring a correction of inventorship action. As noted, *Chou's* holding was moored to the possible reputational interest of the *inventor,* yet here there is no indication that S&P has any kind of reputational interest that could satisfy standing requirements. (Nor does S&P even suggest that it does.) It is the plaintiff's burden to establish standing, and S&P has failed to show that it has any concrete interest (financial, reputational, or otherwise) in the outcome of a correction of inventorship claim. Accordingly, summary judgment will be granted to the defendant on count III.

12

**3. Claim I: Fraudulent Concealment**

As it is set forth in the amended complaint, S&P's first claim can only be described as a muddled hybrid of a state law fraud claim mixed with a hint of inequitable conduct before the Patent and Trademark Office. The claim begins by alleging that KI made "misrepresentations and purposeful omissions" to the PTO when it concealed S&P's involvement in the design. (Am. Compl., ¶ 72.) The claim then asserts that KI had a duty to disclose to S&P that it was filing a patent application and selling S&P designs in the marketplace.

Understandably, KI did not know what to make of this claim until S&P clarified matters in its response brief. In that brief, S&P states that its claim is based on KI's "fraudulent concealment" of the fact that it had applied for patent protection for the CAMPUS-inspired designs.[8] Relying on the state supreme court's decision in *Kaloti Enterprises v. Kellogg Sales,* S&P argues that KI was under an obligation to reveal to S&P that it was applying for patents. 699 N.W.2d 205, 2005 WI 111 (Wis. 2005). In *Kaloti*, the court found that while a duty to disclose does not generally arise in arm's length transactions, in some cases courts would impose just such a duty:

> we conclude that a party to a business transaction has a duty to disclose a fact where: (1) the fact is material to the transaction; (2) the party with knowledge of that fact knows that the other party is about to enter into the transaction under a mistake as to the fact; (3) the fact is peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it; and (4) on account of the objective circumstances, the mistaken party would reasonably expect disclosure of the fact.

*Id.* at 213.

By its plain terms, *Kaloti* is wholly inapplicable to these facts. Most notably, the court in

---

[8] Because KI did not apply for the patents until much more recently, its statute of limitations and laches arguments do not apply to this state law claim.

13

*Kaloti* was grappling with the kinds of duties that arise in the context of a *transaction*.

Kaloti Enterprises had a history of purchasing products from Kellogg in order to resell them to large grocery stores. Kellogg eventually changed its marketing strategy and decided to sell some of its products directly to those same stores. Without informing Kaloti of this about-face, Kellogg induced Kaloti into a contract to buy a substantial amount of Kellogg products. Predictably, when Kaloti tried to resell the products to stores, they told him they would no longer be buying them from Kaloti because Kellogg was now selling to them directly. *Id.* at 210. Kaloti was thus left with a substantial inventory of products now rendered much less valuable that were sold to him by the very party whose own conduct was to blame. Under this set of facts, especially given the past history between the two parties, the court concluded that Kaloti should be allowed to proceed on its misrepresentation claim. In short, the entire purpose of Kaloti's contract was undermined when Kellogg began selling directly to stores, and that was a fact that could be material to the transaction, was within Kellogg's exclusive knowledge, and was one that could be expected to be disclosed.

Here, by contrast, there is no transaction at all. KI's failure to disclose did not induce S&P into any business deal to its detriment, as in *Kaloti*; in fact, not a single one of the *Kaloti* factors applies here. 699 N.W.2d at 213. S&P is essentially asserting some sort of ongoing duty to disclose a patent application that occurred at least five years after the parties had done business together, and that is not a principle even remotely supported by *Kaloti*. Accordingly, summary judgment will be granted in favor of KI on claim 1.

**4. Other Pending Motions**

As noted at the outset, the parties have filed a substantial number of discovery-related and other non-dispositive motions. Though this court has repeatedly questioned the parties' resort to

14

endless motion practice, I note that among the most wasteful of such motions are the motions to strike. For example, in one motion [Dkt. # 235] S&P asks the court to "strike" certain of KI's responses to S&P's proposed findings of fact and some of KI's own proposed findings. The rationale is that KI failed to adequately cite to facts in the record. For its part, KI filed a motion [Dkt. # 244] asking the court to "strike" S&P's "reply" to its own proposed findings of fact on the basis that the local rules do not allow such a reply. The premise apparently shared by both parties is that the answer to improper filings is *more* filings. Not only do such motions ignore the fact that a district court is able to police its own local rules, they burden the court and the other party with an additional motion (and accompanying declarations, exhibits, etc.) whose essential point could be made in a few paragraphs within a dispositive merits brief. For instance, if one party relies on unsupported assertions made in violation of a rule, that can be easily pointed out in the other's merits brief. It should be well known in this circuit by now that courts will continue to frown on motions to strike. As the Seventh Circuit recently reiterated:

> Motions to strike words, sentences, or sections out of briefs serve no purpose except to aggravate the opponent-and though that may have been the goal here, this goal is not one the judicial system will help any litigant achieve. Motions to strike disserve the interest of judicial economy. The aggravation comes at an unacceptable cost in judicial time.

*Redwood v. Dobson,* 476 F.3d 462, 471 (7th Cir. 2007) (citing *Custom Vehicles, Inc. v. Forest River, Inc.,* 464 F.3d 725, 728 (7th Cir. 2006) (Easterbrook, J., in chambers) ("I see about one such motion during each week that I act as motions judge. I have never granted such a motion (and never will); I don't believe that any of my colleagues grants such motions; yet the flow continues.")) Whether the motions to strike are directed to portions of briefs or other filings, they continue to be wasteful in all but a few cases.

15

Of the other pending non-dispositive motions, all of the discovery motions pertain to matters relevant only to the underlying merits of the dispute rather than the issues of addressed in this opinion. These include: KI's failure to produce information about a 1998 meeting in which CAMPUS was discussed [Dkt. # 171]; drawings and files related to the patent's development and conception [Dkt. # 178]; a production model [Dkt. #181]; and answers to interrogatories related to inventorship [Dkt. # 320]. S&P also sought discovery related to KI's foreign law experts, but its motion [Dkt. # 307] does not relate to the narrow foreign statute of limitations issue considered above. S&P also sought leave to file a supplemental response to the latest summary judgment motion [Dkt. # 319], but again the matters raised therein do not pertain to any of the issues addressed herein. For its part, KI sought information about what design rights S&P claims to have assumed from Studio DeLucchi [Dkt. # 184] and further sought discovery under the Hague Convention from witnesses in Italy and Germany. [Dkt. # 197.]

As I noted as far back as March, "This court has neither the time, nor the inclination, to go back and delve [into] each complaint one side has had against the other since the case was commenced." (Dkt. # 193 at 3.) This was reiterated in this court's letter dated September 10. What was true then is even truer now that the most recent motion for summary judgment has rendered these discovery disputes moot. In sum, because none of the non-dispositive motions implicate the considerations material to my decision, I consider them moot and will decline to address them. I have also reviewed the motions for sanctions and conclude that such relief (sought by both sides) is not warranted. Both sides have displayed an unusual inability to get along since this case was filed, and none of the alleged infractions (missing a deposition, failing to produce information, etc.) appears particularly egregious in the overall context of this litigation.

16

**III. Conclusion**

For the reasons given above, the defendant's motion for summary judgment [Dkt. # 270] is **GRANTED**; all claims are dismissed, and judgment will be entered in favor of the defendant. All other motions are **DENIED**.

**SO ORDERED** this 7th day of November, 2007.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge